# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

STACY MILLER,

     Plaintiff,

     v.

CITY OF DARIEN, DONNIE HOWARD,
RYAN ALEXANDER, AND ARCHIE
DAVIS,

     Defendants.

No. 2:17—CV-144

## ORDER

Before the Court is Defendants the City of Darien, Donnie Howard, Ryan Alexander, and Archie Davis's Motion for Summary Judgment. Dkt. No. 53. This Motion has been fully briefed and is ripe for review. For the following reasons, Defendants' Motion is **GRANTED in part and DENIED in part**.

### BACKGROUND

### I.   Factual Background

This case concerns the employment of Plaintiff Stacy Miller with the Darien Police Department ("DPD") and her relationship with her co-worker and fellow DPD investigator, Korone Robinson. In January 2012, Miller, a white female, was provisionally hired by the DPD, which was led by Defendant Chief Donnie Howard. Dkt. No. 53-2 ¶ 1; Dkt. No. 58-2 at 5. Though Miller had no prior law

enforcement experience at the time she was hired, she had a master's degree in criminal justice from Armstrong Atlantic State University, and she underwent preliminary training at the Georgia Peace Officer Standards and Training Course. Dkt. No. 53-2; Dkt. No. 58-1 at 11. After completing her training, Miller began working for the DPD as a patrol officer. Dkt. No. 53-2 ¶ 3. In May 2014, after having worked in patrol for approximately two years, Miller was transferred to the Criminal Investigations Division ("CID") where she worked under Defendant Ryan Alexander. Dkt. No. 60-1 at 1, ¶ 3. Approximately two years later, she was promoted to Sergeant. However, over the next several months, Miller's relationship with the department became increasingly hostile, and she ultimately accepted a position elsewhere.

A. **Relationship with Korone Robinson and alleged discrimination based on Race**

At some point during her tenure with the DPD, Miller began a romantic relationship with Korone Robinson. See Dkt. No. 53-2 ¶ 40; see also Dkt. No. 33 ¶ 45. Robinson was an African-American investigator with the CID, who also worked under Alexander. Dkt. No. 53-2 ¶ 40, 42; see also Dkt No. 33 ¶ 2. During their time at the CID, Robinson and Miller were the only investigators in their unit. See Dkt No. 58-7 at 149.

The timeline of Miller's relationship with Robinson is disputed. Miller acknowledges that by August 2015 Robinson had

asked her to move in with him, dkt. no. 53-2 ¶ 47, and that the two were in a sexual relationship by at least October 2015, id. ¶ 40. Defendants aver that the relationship began much earlier. In September 2015, Robinson sent a text message to Alexander requesting a weekend off because he was "[t]aking her out of town" for an anniversary trip. Dkt No. 58-1 at 151. This, according to Defendants, would place the beginning of Robinson's relationship at September 2014. Dkt. No. 53-2 ¶ 42. Miller stated, however, that Robinson may have been dating a woman named Amanda at the time of that text message. Dkt. No. 60-1 at 16, ¶ 43; Dkt. No. 58-1 ¶ 32. She did not recall having ever taken a vacation with Robinson. Dkt. No. 58-1 at 34. But Alexander testified that he specifically remembers Robinson and Miller dating in the Fall of 2014 because he recalled Miller dying her hair red in response to Robinson broadcasting that he was attracted to redheaded women. Dkt. No. 53-2 ¶ 50. Howard testified that he learned about the relationship in January or February of 2015. Dkt. No. 53-2 ¶ 51.

Irrespective of the factual disputes regarding this timeline, Miller alleges that she was treated unfairly because of her interracial relationship with Robinson. The parties agree that at some point Alexander issued an order restricting Robinson and Miller from riding together in their work vehicle. Dkt No. 53-2 ¶ 57. However, the timing and nature of Alexander's directive is unclear.

When Howard first learned about the relationship in January or February of 2015, he contacted Brett Cook, the Darien City Manager, who advised Howard that he could use his discretion in determining whether to separate Robinson and Miller. Dkt. No. 53-2 ¶¶ 51-53; see Dkt. No. 58-8 at 309-10. Alexander—at that time a close friend of Robinson—persuaded Howard to allow Robinson and Miller to stay together. Dkt. No. 53-2 ¶ 54. A document dated April 13, 2015 suggests that despite his desire to have Robinson and Miller remain co-workers, Alexander told Robinson and Miller not to ride in the same vehicle without prior "approval." Dkt. No. 58-1 at 152. It also documented that Alexander gave verbal counseling to both Robinson and Miller for riding together on April 10, 2015 without his authorization. Id. Moreover, in January 2016, Alexander issued a verbal order to Robinson and Miller, his only CID investigators, that they were not to travel in the same vehicle while on duty. Id. ¶ 55; Dkt. No. 58-7 at 148. In a subsequent deposition, he explained his reasoning, stating,

> [W]e were a two-man investigative unit, and I didn't want something to happen and both of my investigators be in one car at one spot and I had to wait for them to go to the office, swap vehicles and get to where they needed to be. . . And the number two reason. . . was I did not want something to be occurring with both of them in the same vehicle, and instead one of them handling their duties at the time, be worried about protecting the other one.

Dkt No. 58-7 at 149; see also Dkt. No. 53-2 ¶ 56.

AO 72A
(Rev. 8/82)

Despite Alexander's directives, Robinson and Miller continued to ride in the same vehicle without permission. Dkt. No. 53-2 ¶¶ 58-60, 64. Robinson, believing Alexander's orders to be unlawful, chose to deliberately disregard them. Dkt. No. 53-2 ¶¶ 58-60. Miller, on the other hand, often relied on apparently false representations by Robinson that he had permission from Alexander for the two to ride together. Dkt. No. 53-2 ¶¶ 58-60; Dkt No. 58-1 at 39-40, 47. On some occasions Miller tried unsuccessfully to contact Alexander to request permission to ride with Robinson; however, she often found Alexander inaccessible. Dkt. No. 58-1 at 47-48. According to Miller, Alexander was often "nonexistent," being out of contact for extended periods of time. Id. at 49.

Alexander continued to warn Miller and Robinson to heed his instruction but averred that he was simply "laughed off." Dkt. No. 53-2 ¶ 66. On one occasion, Howard observed the two riding together during the workday in Glynn County, outside DPD jurisdiction. Dkt. No. 53-2 ¶ 74. Though Miller acknowledges this may have been true, she believed that the two could have been on their way to the gym, which she argues she was permitted to do during the workday. Dkt. No. 58-1 at 48-50. Defendants deny that DPD permitted officers to use outside exercise facilities during the workday. Dkt. No. 59 ¶ 10.

### B. Other Evidence Relevant to Defendants' alleged Discrimination

Miller alleges that, in addition to the aforementioned evidence of racial discrimination related to her interracial relationship with Robinson, she also experienced other instances of racial discrimination, as well as gender discrimination.

### 1. Evening Shift and Evidence Room

First, Miller alleges that as an investigator, she was given certain arbitrary and unreasonable assignments that her male counterparts were not asked to complete. For example, at some point while Miller was working for the CID, Alexander asked her to work an evening shift from 4:00 P.M. to midnight Dkt. No. 58-1 at 52, 154. Alexander did not give Miller an explanation for transitioning her to this shift, and Miller testified that she had never heard of an investigator working night shift unless a separate investigative team was working during the day. Dkt. No. 58-1 at 51-52. Miller ultimately found it impracticable to work the evening shift because some of her duties required her to interact with institutions that were only open during the day, such as the bank, the judiciary, and the district attorney's office. Id. At 52. In her deposition, Miller testified that she could not accomplish her necessary day-time duties and work a full night shift because of the department's opposition to overtime. See Dkt. No. 58-1 at 52. Accordingly, Miller continued to perform her day-time duties in contravention of Alexander's request. Id.; Dkt. No. 53-2 ¶ 81. She

conceded that though she occasionally worked a later shift than her traditional day-time shift, she never completed a full evening shift. Dkt No. 58-1 at 53-54; Dkt. No. 53-2 ¶ 81.

On a separate occasion, Alexander asked Miller to implement a scanning system in the evidence room. Dkt. No. 53-2 ¶ 82; Dkt. No. 58-1 at 154, 157. Because department policy forbid individuals from working alone in the evidence room, Alexander asked Miller to coordinate with Frank Williams, a part-time employee, to work with her on the project. See Dkt. No. 58-1 at 54, 86-87, 157. Miller alleges that because of Williams's busy schedule—and due to her lack of authority over Williams—she was unable to consistently schedule times to meet with him to work in the evidence room. Id. At 54-56. Though Miller met with Williams on one occasion, and he helped her clean and organize the evidence room, Williams had canceled on so many occasions that Miller admitted that she eventually gave up trying to complete the project. Dkt. No. 58-1 at 56, 157.

### 2. Vehicle Assignments

Miller also contends that during her time at the CID, she was routinely issued vehicles that were either inferior to those of her male employees or inadequate to perform the job of an investigator. According to Miller, an adequate investigator's vehicle should be unmarked and contain an inconspicuous set of lights and sirens, along with a radio. Dkt. No. 58-1 at 85-86.

Though Defendants acknowledge that Miller's vehicles did not always meet these criteria, they allege that the DPD distributed vehicles reasonably and in accordance with resources that were available at the time.

According to Miller, when she began working for the CID, she was assigned an unmarked 2006 Chevrolet Impala. Dkt. No. 53-2 ¶ 31; Dkt. No. 58-1 at 162. Though her predecessor had been driving an unmarked Charger, this vehicle was transferred to the McIntosh County Sheriff's Office after she took over the position. Dkt. No. 58-1 at 162. In August 2015, Miller was involved in an accident with the Impala for which she was not at fault. Dkt. No. 53-2 ¶ 31; Dkt. No. 58-1 at 162. She alleges that all the seized vehicles that the DPD had available were sold, and she was instead assigned a marked 2007 Crown Victoria K-9 patrol car. Dkt. No. 58-1 at 162. This vehicle, according to Miller, "would be considered the worst vehicle the department owns." Id. Though Defendants contend that the DPD had no other fully-equipped vehicles available for Miller to use at the time, dkt. no. 53-2 ¶ 33, Miller alleges that the department had an older—though albeit unequipped—Tahoe or Suburban that would have been more appropriate for her use, see dkt. no. 58-1 at 84-85.

In February 2016, Miller filed a formal grievance with the DPD complaining about, inter alia, her inadequate vehicle. Id. at 159-65. Shortly after she submitted her grievance, she was assigned

an unmarked Tahoe. Id. at 85. Though she believed the Tahoe was eventually fitted with a radio, she never received a set of lights or sirens. Id. at 84-85. The parties dispute whether a newer seized Audi vehicle was available for Miller's use at that time. According to Miller, the paperwork was completed on the vehicle, but her request to use the vehicle was nonetheless denied. Id. at 85. She alleges that the Audi was later assigned to Robert Keith, a male CID investigator. Id. Defendants contend that Howard, who had authority to assign vehicles for the department, was originally undecided about whether the Audi should be sold. Dkt. No. 53-2 ¶ 36; Dkt. No. 58-1 at 17. During that time, Howard drove the vehicle because a recent shoulder surgery rendered him unable to get in and out of his truck. Dkt. No. 58-2 at 17. Defendants assert that by the time Howard's shoulder had recovered, he had learned that Miller was seeking a job elsewhere and therefore assigned the vehicle to Keith, who was her replacement. Dkt. No. 53-2 ¶ 37-38; see Dkt No. 60-1 at 13, ¶ 84. But Miller challenges this timeline, asserting that she had not given notice of her intent to leave the department until after Keith had been assigned the Audi. Dkt. No. 58-1 at 84; Dkt. No. 60-1 at 16, ¶ 38.

### 3. The Long Gun

Next, Miller alleges that the DPD refused to assign her a "long gun" despite assigning all similarly situated male officers with such a weapon. Specifically, in August 2012, while still

working as a patrol officer, she was appointed to the Special Response Team ("SRT"), which included officers from DPD and the McIntosh County Sheriff's Department who would assist either agency in executing search or arrest warrants. Dkt. No. 33 ¶ 30. According to Miller, every DPD officer on the SRT, excepting her, was issued a long gun. Id. ¶ 36.

Defendants dispute this contention. They allege that long guns were not issued to every officer on the SRT and that many of the officers who Miller assumed had been issued long guns were actually carrying personal weapons that they had qualified to use in the SRT. Dkt. No. 53-2 ¶ 14-15. According to Defendants, the police department retained only four long guns to distribute among fifteen to eighteen members of the SRT. Id. ¶ 17. They allege that while an M-4 rifle became available at one time, Miller lost a formal "shoot-off" for the weapon to Bobby Gault, a fellow SRT member. Id. ¶ 18-19; Dkt. No. 58-2 at 42. They further contend that Miller later purchased her own M-4 that she eventually qualified to carry on SRT. Dkt. No. 53-2 ¶ 21.

Miller concedes that she is not aware how many officers on the SRT may have been carrying their own guns. Dkt. No. 60-1 at 14, ¶ 15. She does dispute, however, that she lost a formal shoot-out for the M-4 to Bobby Gault. Id. ¶ 19. Instead, she asserts that she had a friendly informal competition with Gault over a pistol, that she admittedly lost. Dkt. No. 58-1 at 94. She states

that subsequently "they just decided to give him the M-4 as well."
Id. She admitted, however, that "[t]here could have been" a
competition for the M-4, but she did not remember. Id. at 95. She
did recall another competition between her department and the
sheriff's office where she alleges that she "out-shot" everyone in
her department. Id. at 95. She admits that she "[p]robably" bought
her own M-4 and began carrying it while she was on the SRT. Id. at
95-96.

### 4. K-9 Training

In addition, Miller alleges that she was deprived of the
opportunity to fully participate in K-9 training because of her
gender. Dkt. No. 33 ¶ 37. Specifically, she contends that she
volunteered to wear a "dog biting suit" to allow the police dog to
practice precision moves. Id. However, when Howard learned that
Miller was participating in training, he ordered her to stop
because of her size and gender. Id.

Defendants concede that Howard ordered the department not to
permit Miller to use the dog suit but allege that the order was
exclusively related to Miller's size, rather than her gender. Dkt.
No. 53-2 ¶ 22-30. According to Defendants, the only dog bite suits
owned by the DPD are size large. Id. ¶ 22. At one point, Howard
saw a video that had been posted online by one of his officers
depicting Miller participating in dog-bite training. Id. ¶ 24. In
the video, Howard noticed that when the dog bit Miller's left arm,

a portion of the suit pulled away, exposing Miller's shoulder. Id. As a former K-9 handler, Howard was concerned that if the dog had transitioned to another bite, it could have bitten Miller's uncovered shoulder. Id. ¶ 25. Accordingly, Howard informed officers in the unit that Miller should not be participating in K-9 training. Id. ¶ 26-27.

Moreover, Defendants introduce evidence that Miller is objectively smaller than other officers deemed too small to safely participate in K-9 training. Specifically, Howard acknowledged that he, a five-foot, five-inch male, is too short to wear any of DPD's dog-bite suits. Dkt. No. 53-2 ¶ 23; Dkt. No. 58-2 at 49. Because of his height, the suit slides underneath his feet when he tries to move backwards. Id. Howard also forbade Austin Sanchez, a five-foot-six, one-hundred and twenty-one pound officer, from wearing the dog-bite suit . Dkt. No. 53-2 ¶ 30. In contrast, Miller is only five-foot-two and one-hundred and twenty pounds. Id.

Miller does not challenge Defendants' allegation that the DPD only retains large dog-bite suits, dkt. no. 58-1 at 90 (acknowledging that she is not aware of the size of the DPD dog-bite suits), and she could not specifically identify anyone at DPD of her stature who was permitted to wear the suits, id. at 90-91 (identifying only Will Jennings as comparable to her in size but acknowledging that Jennings weighed more than her and expressing uncertainty about whether he actually wore the suit). She did

state, however, in her February 2016 grievance to the DPD, that Howard advised her not to wear the dog bite suit because "we take care of our women." Id. at 163. She acknowledged in a later deposition that Howard had also expressed concern about the suit not fitting properly due to her size. Id. at 91-92.

**5. Pay, Work Duties, and Promotions**

Finally, Miller alleges discrepancies in pay, work duties, and promotions between herself and her male counterparts. First, Miller asserts that both her CID predecessor, Nick Roundtree, and her successor, Robert Keith, were both paid more than her at the beginning of their tenure with the CID. Dkt. No. 33 ¶ 40; Dkt No. 58-1 at 70-71; see also Dkt. No. 59 ¶ 3. She also alleges that she did not have the benefit of an assistant, unlike Keith and Roundtree. Dkt No. 58-1 at 71, 85. Defendants acknowledge that both Roundtree and Keith made more than Miller when starting at the CID. Indeed, while Miller had a starting pay of $13 per hour, Roundtree was paid $15.91 per hour and Keith was paid $18 per hour. Dkt. No. 59 ¶ 2, 5. But Defendants also introduce evidence that both Roundtree and Keith had significantly more law enforcement experience than Miller. According to an affidavit from Howard, when starting with the DPD, Roundtree and Keith already had approximately ten and twenty-five years of experience,

respectively. Dkt No. 59 ¶ 3.[1] Though Miller acknowledges that she may have had less experience than these individuals, she asserts that she had more education than anyone in her division. Dkt. No. 58-1 at 72 (suggesting that she was not aware of any others in her division with a master's degree).

Next, Miller contends that during her time at the DPD, Joe Creswell and Aaron Turner, who each had less experience, were promoted above her to Corporal. See Dkt No. 58-1 at 162; See also Dkt. No. 60-1 at 4, ¶ 24. Defendants acknowledge this is true, but they note that both Turner and Creswell's promotions were a change in title only, rather than a raise, Dkt. No. 53-2 ¶ 6, a fact which Miller does not dispute. Furthermore, Defendants contend that a comparable promotion to corporal would not have led to any substantive changes in Miller's authority as investigator because there was no one else in the CID for her to supervise. Dkt. No. 52-2 ¶ 7; see also Dkt. No. 58-1 at 86. Miller challenges this contention, asserting that there were two part-time individuals in the CID that she would have overseen had she received a promotion. Dkt. No. 60-1 at 14, ¶ 7; Dkt. No. 58-1 at 87-88.

Finally, Miller asserts that though she was ultimately promoted to Sergeant, the promotion did not actually increase her

---

[1] Miller also stated in her deposition that Robinson and Alexander made more than her at the CID. Dkt. No. 58-1 at 71. Miller admitted, however, that Alexander outranked her at the CID. See id. (indicating that Alexander was a lieutenant). The parties do not provide any evidence of Robinson's salary or his years of experience in law enforcement at the time he was hired by the CID.

rank in any way that would be recognized by her peers. Dkt. No. 58-1 at 88-89; Dkt. No. 60-1 at 4, ¶ 26. Miller's testimony on this point is somewhat ambiguous. However, she seems to complain that the DPD does not technically recognize the title of Sergeant for an investigator. See Dkt. No. 58-1 at 88-89. As she explains, "I kind of took it as like, you know, you're promoting me but it's kind of a slap in the face because nobody is going to actually call me sergeant." Id. at 89. Nevertheless, Defendants note that Miller's promotion did come with a pay raise to $16 per hour, dkt. no. 53-2 ¶ 13, which is the same amount that Turner and Creswell made when they received a comparable promotion, dkt. no. 59 ¶ 2.

## C. Miller's Reprimand, Promotion, and Resignation

On February 3, 2016, Alexander—who was still Miller's CID supervisor—met with Miller to discuss certain issues regarding her performance. Dkt. No. 53-2 ¶ 73. The soon-to-be acting Darien City Manager, Defendant Archie Davis, was also present at the meeting. Dkt. No. 53-2 ¶ 84; see also Dkt. No. 53-2 ¶ 93; Dkt. No. 58-3 at 7. According to an unsigned record of the meeting introduced by Defendants, Miller was formally reprimanded for three alleged infractions, including 1) continuing to ride in the vehicle with Robinson without Alexander's permission; 2) failing to work on the evening shift consistent with Alexander's instruction; and 3) failing to implement a scanning system in the evidence room consistent with Alexander's instruction. Dkt. No.

58-1 at 154-55. According to the record, Alexander advised Miller that while these infractions could merit termination, he instead intended to demote her to the patrol division. Id. at 155. During the meeting, Miller requested an "Equal Employment Opportunity Complaint." Id. Following the meeting, Davis spoke with Howard, and the two determined that, rather than transferring Miller to patrol, she should remain in the CID under the command of Anthony Brown, see dkt. no. 53-2 ¶¶ 84-86, another lieutenant with the DPD, dkt. no. 58-4 at 7-8.

On February 10, 2016, Miller met with Davis and Brown at which time Miller was informed that she was being transferred to Brown's command. Dkt. No. 53-2 ¶ 88. During the meeting, Miller was advised that she would still be able to take a previously scheduled nine-day vacation and a two-week training course that she had been asked to attend. Id. ¶ 91-91. She was also advised that she was in line for a promotion and that her February 3, 2016 written reprimand would be removed from her record if six months elapsed with no further disciplinary problems. Id. ¶ 92-93. Finally, Davis and Brown offered to assist Miller in obtaining her own vehicle, which she did not have at the time. See id. ¶ 89. In the months after the meeting, Miller concedes that the promises made during that meeting were fulfilled. Dkt. No. 53-2 ¶ 97. Specifically, Miller was promoted to Sergeant with a raise to $16 per hour, dkt. no. 59 ¶2, and she was permitted to take her nine-day vacation, as well

as attend the training program dkt. no. 53-2 ¶ 99. Her written reprimand was also removed after six months. See Dkt. No. 58-3 at 36.

Shortly after the February 10 meeting, Miller filed a charge with the Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 53-2 ¶ 94. In the form document dated February 11, 2016, Miller checked boxes indicating that she believed she had been discriminated against in her employment on the basis of sex and that she experienced retaliation. Dkt. No. 58-1 at 158. She also checked the box for "Other," specifying, "Equal Pay Act" in the margin. Id. In her charge, Miller alleged that despite having been a "good employee" during her tenure with the DPD, she had learned in 2014 that she was being paid less than newly hired officers. In 2015, she reported that she had complained to Alexander about the pay discrepancy, as well as discrepancies in her training and vehicle assignments. She stated that nothing has been done about this complaint. She further indicated that after having issued her complaint, she had been demoted from her investigator position and told that she could no longer use her city vehicle for personal use. Id.

Over the next several months, Plaintiff had several meetings with various Darien officials, including Davis, Howard, and Alexander. See generally, Dkt. No. 61. Miller surreptitiously recorded many—though not all—of these meetings. Dkt. No. 58-1 at

D 72A
ev. 8/82)

100-01; Dkt. No. 60 at 4. It is not clear when the first meeting occurred. According to Defendants, Davis first chose to meet with Miller following a June 2016 call from an EEOC investigator, who advised Davis that the city's response to Miller's EEOC charge was due shortly. Dkt. No. 53-2. This prompted Davis to meet with Miller because he had previously been under the impression that Miller intended to drop the charge. Id. ¶ 103-104. However, transcripts of Miller's recorded conversations show that Miller met with Davis and Howard as early as March 29, 2016 and again with Davis on March 31. See Dkt. Nos. 61-1, 61-2. At the conclusion of this meeting, Davis informed Miller that, according to the city's attorney, one way to resolve the EEOC dispute would be for Miller to draft a letter stating "whatever it is that exonerates Ryan and the Chief from anything that was said in [her] grievance," and that Howard would "write a letter stating that, because this whole process is over with now. . . no repercussions on [Miller] in any way can be brought about." Dkt. No. 61-1 at 105. He further proposed that Alexander would draft a letter stating that "the letter from [Miller] satisfies him, and that he will take no action against [Miller] at all as far as legal stuff. . . in the future." Id.

Miller alleges that at some point the meetings began to take a more threatening tone. See Dkt. No. 60-1 at 11, ¶ 69. For example, during a meeting on March 31, Davis told Miller, "you put me, [Alexander], and [Howard] up on the spot, which means we're going

AO 72A
Rev. 8/82)

to have to fire back." Dkt. No. 61-2 at 29. He later stated, "[Y]ou know [Howard]. You think you put his back against the wall that he's going to cave for that EEOC guy?" Id. at 94. Moreover, in a separate, presumably unrecorded meeting, Miller alleges that Davis told her that "he was going to go around the entire department and have everybody else write a statement contradicting what [she] said at [her] grievance and . . . would have to get [the] GBI involved and . . . negate what [she] was saying." Dkt. No. 58-1 at 100. Though Defendants admit that Davis did comment on getting the GBI involved, they characterize his statement as threatening to bring in the GBI "*if* there were contradicting statements." Dkt. No. 53-2 ¶ 108 (emphasis added). Davis claims that Brown, Alexander, Howard, Korone, and Miller had all advised him that there were false statements in the EEOC charge. Dkt. No. 58-3 at 41. Eventually, Miller began to feel "like the whole department was trying to falsify everything that [she] was saying. Like they were all going to come together and say this isn't happening and she's just making this up. . ." Dkt. No. 58-1 at 101.

On June 15, 2016, Miller withdrew her EEOC charge, stating in the withdrawal form document, "I have been promoted to an investigator 2 and I have been issued unmarked vehicle." Dkt. No. 58-1. On that same day, Miller indicated in a separate letter to EEOC investigator James Love that she wanted to withdraw her discrimination charge with the DPD for the same reasons. Dkt. No.

58-1 at 166. She stated that her previous supervisor had resigned and that she was "much happier under the leadership of [her] current immediate supervisor." Id. Later in this letter, however, she expressed concerns about ongoing issues with her employment and other reasons for having withdrawn her charge. Specifically, she stated,

> Although I feel like there are still some issues that I am dealing with such as denial of special assignments and off duty work, I feel that the majority of my initial concerns have been addressed. I stand by all the allegations in both my Equal Opportunity Complaint and the grievance that I filed with Darien Police Department, but feel that it is in my best interest to try to move forward. After multiple threats of having GBI investigate me for false statements, the threat of losing my job, and the turmoil that this complaint has caused among my Department, I feel that continuing with the complaint will only add undue stress to the situation. It has been difficult to proceed with the work that needs to be done when constantly being called into meetings to discuss this complaint.

Id.

At some time around the withdrawal of Miller's charge, Robinson was transferred to patrol. Dkt. No. 53-2 ¶ 116. The parties dispute, however, whether the transfer came before or after Miller's withdrawal. According to Miller, there is no evidence in the record depicting the date Robinson was transferred to patrol. Dkt. No. 60-1 at 20, ¶ 116. Defendants contend that, according to testimony by Robinson, he was transferred to patrol during a two-week absence where he saw an individual named Kidder. Dkt. No. 53-2 ¶ 116. Moreover, a text message exchange between Howard and

Kidder from May 4, 2016 suggests that Kidder met with Robinson on or around that time. Dkt. No. 58-10 at 77-79. Defendants also allege that on July 27, 2019, Robinson was given thirty days to find a new job after having made an untrue statement on the radio reflecting poorly on the police department. Dkt. No. 53-2 ¶ 118. After more than thirty days passed, DPD terminated his employment on August 3, 2016. Id. ¶ 119. Miller also refutes the reliability of these dates. Dkt. No. 60-1 at 21, ¶ 118-19. In any event, the parties agree that Miller claims to have immediately begun seeking other employment after Robinson's discharge, fearing that she would also soon be terminated. Dkt. No. 53-2 ¶ 120. They also agree that Miller did not participate in Robinson's radio comment that allegedly resulted in his termination. Id. ¶ 121.

Sometime around August 2016, a member of the McIntosh County School Board contacted Howard seeking a reference for Miller. Id. ¶ 122, 125. A few weeks later, Miller approached Howard to advise him she was applying for a position with the school board. Id. ¶ 124. According to a personnel record appended to an affidavit submitted by Howard, Robert Keith was hired by the DPD on August 22, 2016. Dkt. No. 59-1 at 71. Though Miller disputes this date, stating it is part of a "self-serving affidavit," she does not present any evidence specifically calling into question the validity of the employment record. Dkt. No. 60-1 at 21, ¶ 126.

After Miller was offered the school board job, Howard agreed that Miller could continue working part-time at the DPD until her upcoming retirement vested. Dkt. No. 53-2 ¶ 127. However, after Miller had accepted the job, she received a call from Davis, who advised that, according to the city attorney, employees could not accrue credit toward retirement while working part-time. Id. ¶ 128. Davis noted that she would be permitted to stay on as a full-time patrol officer for as long as she needed for her retirement to vest. Id. ¶ 129. Miller declined this offer. Id. Miller later conceded that her claim that she was "forced to resign" was based on the statement by Davis that she would have to remain as a full-time patrol officer if she wanted to remain with the DPD. Dkt. No. 58-1 at 122.

On March 13, 2017, Miller filed a second EEOC charge. Dkt. No. 53-2 ¶ 131. In the form document for this charge, she again checked boxes indicating that she had been discriminated against on the basis of sex and that she had also experienced retaliation. Dkt. No. 58-1 at 174. She specifically complained that males in her department were given "special treatment" concerning wages, duties, and assignments. Id. She complained about a male in her department who was given a vehicle that she was told she could not drive. Id. She also noted that Davis forced her to resign after Howard had approved her part-time status by stating that if she

did not resign she would be involuntarily transferred to the patrol unit. Id.

## II. Procedural History

Following Miller's second charge, the EEOC issued a right to sue letter. Dkt. No. 33 ¶ 7. She thereafter filed this suit on December 6, 2017. Dkt. No. 1.

### LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Ci. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Investor Group.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. Factual disputes that are "irrelevant or unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the

pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332) (Brennan J. dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

I.   **Miller's Race Discrimination Claims under 42 U.S.C. § 2000e et seq.**

Under Count I, Miller brings claims against Defendants for race and gender discrimination under 42 U.S.C. § 2000e et seq ("Title VII"). Defendants argue that Miller's claims for racial discrimination under Title VII must be dismissed because she failed

AO 72A
(Rev. 8/82)

to exhaust her administrative remedies as required by statute. Before filing a Title VII action in the district court, a plaintiff must exhaust her administrative remedies by filing a charge of discrimination with the EEOC. Gregory v. Ga. Dep't of Human Res., 335 F.3d 1277, 1279 (11th Cir. 2004). Though the Supreme Court has recently held that Title VII's exhaustion requirement is not a prerequisite to a court's jurisdiction, Fort Bend Cty. v. Davis, 139 S. Ct. 1843, 1851 (2019), it is nonetheless a statutory prerequisite to a valid Title VII action, see Stuart v. Jefferson County Dep't of Human Res., 152 Fed. App'x. 798, 800 (11th Cir. 2005).

The purpose of the exhaustion requirement is to allow the EEOC "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntarily compliance and promoting conciliation efforts." Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 929 (11th Cir. 1983). Thus, in determining whether a plaintiff has effectively exhausted her remedies, her complaint will be considered "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory, 335 F.3d at 1280. Because courts are "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII," the scope of an EEOC charge "should not be strictly interpreted." Id. (quoting Sanchez v.

Standard Brands, Inc., 431 F.2d 455, 465-66 (5th Cir. 1970)).
Claims in district court will be permitted if they "amplify,
clarify, or more clearly focus" allegations from the original EEOC
charge. Id. (quoting Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir.
1989). Claims will not be allowed, however, where they allege "new
acts of discrimination." Id.

Here, the only allegations in Miller's March 2017 EEOC charge
are related to her claims of gender discrimination and retaliation.
Indeed, the only facts that Miller identified were that male DPD
officers were given preferential treatment in wages, duties, and
assignments and that she was forced to resign after Howard approved
her part-time status. Miller argues that these claims are
sufficient to satisfy Title VII's exhaustion requirement because,
as in Gregory, her race-based claims "grew out of" the claims from
her original charge. Dkt. No. 60 at 8 (citing Gregory, 335 F.3d at
1280). Gregory, however, is distinguishable. In that case, the
court found that the plaintiff's failure to expressly identify
retaliation in her EEOC charge did not bar her retaliation claim
in federal court because the facts related to that claim were
"inexplicably intertwined with her complaints of race and sex
discrimination." Gregory, 355 F.3d at 1280. In reaching this
conclusion, the court noted that "[a]n EEOC investigation of her
race and sex discrimination complaints leading to her termination
would have reasonably uncovered any evidence of retaliation." Id.

AO 72A
Rev. 8/82)

In contrast, none of the facts that Miller identifies in her EEOC charge to support her claim of gender discrimination or retaliation were "intertwined" with those facts that now support her claim of racial discrimination. Nor would her complaints that males were given better treatment reasonably put an EEOC investigator on notice that he or she should search for evidence of racial discrimination. To be sure, nothing on the face of Miller's charge even makes her race—or the race of her coworkers—apparent.[2] Accordingly, Defendant's motion with respect to Miller's claims of racial discrimination under 42 U.S.C. § 2000e *et seq* is **GRANTED**.

## II.  Miller's Race Discrimination Claims under 42 U.S.C. § 1981

Although Miller failed to exhaust her race discrimination claims under Title VII, in Count II Miller alleges claims of racial discrimination under 42 U.S.C. § 1981. "A plaintiff is not required to exhaust h[er] administrative remedies before filing a § 1981 action in federal court." Price v. M & H Valve Co., 177 Fed. App'x 1, 9 (11th Cir. 2006). Aside from the exhaustion rule, discrimination claims brought under Title VII and § 1981 "are

---

[2] Miller also argues that because her grievance to the DPD, as well as a separate EEOC charge by Robinson, alleged facts relating to her relationship with Robinson, that Defendants "cannot . . . claim any surprise or prejudice by the race claims brought by Plaintiff." Dkt. No. 60 at 8. However, whether the Defendants would be prejudiced by the introduction of new claims in the complaint is not the standard for exhaustion under Title VII. Moreover, Miller has not pointed to any authority for the proposition that independent grievances to employers or separate charges filed by a different employee are adequate to put the EEOC on notice of the plaintiff's charge or otherwise satisfy Title VII's exhaustion requirement.

subject to the same standards of proof and employ the same analytical framework." McCray v. Wal-Mart Stores, Inc., 377 Fed. App'x 921, 923 (11th Cir. 2010) (quoting Bryant v. Jones, 575 F.3d 1281, 1296, n.20 (11th Cir. 2009)). To prove intentional discrimination in a disparate treatment claim under Title VII, a plaintiff must show discriminatory intent either through direct or circumstantial evidence. E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." Id. (citations omitted). "Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas paradigm for circumstantial evidence claims." Id.

Under that framework, the first step requires a plaintiff to show a prima facie case of racial discrimination. "Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Rioux v. City of Atlanta, 520 F.3d 1269, 1275 (11th Cir. 2008). Under the traditional rule, "[t]o make out a prima facie case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside [his] class more favorably." Crawford v. Carroll, 529 F.3d 961,

970 (11th Cir. 2008). However, the Eleventh Circuit has also recognized that "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). Other methods recognized by the Eleventh Circuit include where a plaintiff, can show "other evidence of discrimination," despite the absence of a comparator. Rioux, 520 F.3d at 1277 (finding a prima facie case where a plaintiff in "the absence of a similarly-situated employee . . . has also come forward with "other evidence of discrimination"). Furthermore, the Eleventh Circuit has stated that absent a comparator, a plaintiff can still survive a motion for summary judgment where he presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); see also Washington v. United Parcel Serv., Inc., 567 F. App'x 749, 752 (11th Cir. 2014).

If a plaintiff can establish a prima facie case, a presumption of discrimination in favor of the plaintiff is created and the burden of production then shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its actions." Wilson, 376 F.3d at 1087. If the employer satisfies this burden, "then the presumption of discrimination is rebutted, and the burden of

production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Id.

Ultimately, "the Eleventh Circuit allows a Plaintiff to survive summary judgment 'if [s]he presents circumstantial evidence that creates a triable issue regarding the employer's discriminatory intent.'" Cook v. Glynn-Brunswick Hosp. Auth., No. CV 213-152, 2015 WL 9690385, at *9 (S.D. Ga. Sept. 30, 2015) (quoting Smith, 644 F.3d at 1328). In other words, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." Smith, 644 F.3d at 1328. Here, Miller has failed to establish a prima facie case of racial discrimination either through direct or circumstantial evidence.

## A. Direct Evidence

First, Miller argues that she has introduced direct evidence of racial discrimination by Defendants. As noted, "direct evidence" is "evidence which, if believed, proves the existence of fact in issue without inference or presumption." Gonzalez v. State Dep't of Mgmt. Servs., 683 Fed. App'x 738, 742 (11th Cir. 2017) (quoting Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 12227 (11th Cir. 2002)). Evidence of statements that are subject to more than one interpretation are not considered direct evidence of discrimination under Title VII. Carter v. Three Springs

Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998) (citing

Harris v. Shelby County Bd. Of Educ., 99 F.3d 1078, 1083 n.2 (11th

Cir. 1996). Instead, "[o]nly the most blatant remarks, whose intent

could mean nothing other than to discriminate on the basis of some

impermissible    factor    constitute    direct    evidence    of

discrimination." Gonzalez, 683 Fed. App'x at 742 (quoting Wilson

v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004)).

Moreover,   for   direct   evidence   to   constitute   evidence   of

discrimination, it must "correlat[e] to the discrimination or

retaliation complained of by the employee." Carter, 132 F.3d at

641 (internal quotation omitted).

     Miller relies primarily on two incidents that she argues

constitute direct evidence of discrimination. First, she points to

a recorded conversation between Howard, Miller, and Davis, in which

Howard  acknowledged  that  he  wanted  to  "separate"  Miller  and

Robinson because he thought their interaction at work was a "bad

idea." See Dkt. No. 61-1 at 13. Specifically, Howard remarked,

> Ryan [Alexander] asked me to let y'all work together,
> and against my better judgment. . . last February. . .
> when I found out you two were having an affair, I wanted
> to separate you then. I didn't want to take you off of
> CID, I just wanted the two separated because I thought
> it was a bad idea.

Id.

     This statement is not the type of "blatant remark[]" that

intrinsically shows an intent to discriminate. Gonzalez, 683 Fed.

App'x at 742 (quoting <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1086 (11th Cir. 2004)). Instead, it is subject to non-discriminatory interpretations. For example, Howard could have been opposed to the way the relationship, which he specifically characterized as "an affair," might be perceived outside of the department. Indeed, just shortly after he made this statement, he also commented,

> [I]f you two make a case and some attorney . . . catch[es] wind that you two are having an affair . . . and when you two have worked this whole case, and when you're sitting on that stand, they look at you and they say, you ever lied, Ms. Miller?"

Dkt. No. 61-1 at 13.

Moreover, Howard might have been concerned about practical problems with workplace relationships, such as distractions from work duties. Just before he made the allegedly discriminatory remark about separating Robinson and Miller, Howard had been discussing the incident where he witnessed Robinson and Miller riding outside of their jurisdiction during work hours. <u>See</u> Dkt. No. 61-1 at 8-12. This, at least in Howard's view, was a violation of DPD policy. Accordingly, Howard's statement about separating the couple seems to be, at least in part, bemoaning the fact that he did not break up the relationship before it resulted in insubordination.

Second, Miller argues that Howard admitted to racist acts in the past, including having fired a BB gun at black people

attempting to take watermelon from the side of the road; having allowed Alexander to display a Nazi flag; and having stated that he would vomit if his daughter was in a relationship with a black man. Though these examples might be circumstantial evidence that Howard opposed the racial makeup of Robinson and Miller's relationship, they also do not constitute direct evidence of discrimination because they do not "correlat[e] to the discrimination or retaliation" about which Miller complained. Carter, 132 F.3d at 641 (internal quotation omitted). In Carter, the court found the admission by the defendant's program director of a "bias against blacks," was not direct evidence of discrimination against the plaintiff because her admission that she had a bias was "not the same as saying that [she] exercised that bias in the case of [the plaintiff's] promotion." Carter, 132 F.3d at 642. Likewise, there is no evidence here that Howard's allegedly racist acts were evidence that he also acted with racist motives in discriminating against Miller. Accordingly, there is no direct evidence of discrimination against Miller.

## B. Prima Facie Case

Absent direct evidence, a plaintiff may still survive summary judgment by relying on circumstantial evidence under the McDonnel Douglas framework. Beginning with the prima facie case analysis, the parties dispute both the third and fourth elements—that Miller was subject to an adverse employment action and that Defendants

treated similarly situated employees outside of Miller's protected class ("comparators") more favorably. The Court finds, based on the undisputed evidence, that Miller has failed to establish she was subject to an adverse employment action related to her racial discrimination claims.

The non-discrimination provisions of Title VII require a plaintiff to show that she was discriminated against with respect to her "compensation, terms, conditions, or privileges of employment." 48 U.S.C. § 200e-2(a). Courts have interpreted this statutory language, generally known as an "adverse employment action," as requiring a showing that the plaintiff experienced a "serious and material change in the terms, conditions, or privileges of employment." Butler v. Ala. DOT, 536 F.3d 1209, 1215 (11th Cir. 2008) (quoting Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239-40 (11th Cir. 2001)) (emphasis omitted). In making such a showing, a plaintiff's subjective beliefs about the materiality of the action are not controlling. Grant v. Miami-Dade Cnty. Water & Sewer Dep't, 636 Fed. App'x 462, 466 (11th Cir. 2015). Instead, the plaintiff must show that the action was "materially adverse as viewed by a reasonable person in the circumstances." Butler, 536 F.3d at 1215 (quoting Davis, 245 F.3d at 1239-40).

Here, Miller's racial discrimination claims are predicated on her interracial relationship with Robinson. Essentially, Miller

alleges that she was subject to a series of adverse employment actions after Defendants learned that she and Robinson were dating. However, she does not show how any of these actions materially affected her "compensation, terms, conditions, or privileges of employment." 48 U.S.C. § 200e-2(a). The undisputed evidence shows that in early 2015, Howard learned about the relationship between Robinson and Miller and had considered separating them with respect to their work duties. Though Alexander persuaded Howard to allow the couple to continue working together, he issued a directive prohibiting them from riding together during work hours without his authorization. After Robinson and Miller repeatedly disobeyed Alexander's order, he encouraged them to stop, but the two nevertheless persisted. In February 2016, Alexander and Davis met with Miller and formally reprimanded her for, inter alia, having disobeyed Alexander's order. Though Alexander advised Miller at that time that she would be demoted to patrol, Davis and Howard later agreed that she would remain in the CID under the command of a different supervisor.

Neither Alexander's directives proscribing Miller's trips with Robinson nor his subsequent reprimands are adverse employment actions under Title VII. The Eleventh Circuit has held that while Title VII does not necessarily require proof of direct economic consequences to establish an adverse employment action, "the asserted impact cannot be speculative and must at least have a

tangible adverse effect on the plaintiff's employment." <u>Hooks v. Bank of Am.</u>, 183 Fed. App'x 833, 836 (11th Cir. 2006) (quoting <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1238 (11th Cir. 2001)). In <u>Hooks</u>, the court found that the plaintiff, a former bank teller, had not demonstrated an adverse employment action when she alleged her employer had issued two formal reprimands, withheld her building key, and restricted her ability to cash non-account holder checks. <u>Id.</u> The court held that these actions had not resulted in "any *material* change to the terms or conditions" of the plaintiff's employment, such as to her pay, hours, or job duties. <u>Id.</u>

Likewise, Alexander's order that Miller could not ride with Robinson without authorization did not materially affect the condition of Miller's work at the CID. At worst, Miller testified that the directive interfered with her work because she or Robinson would have had to stop and seek permission before completing certain tasks. However, this assertion is bellied by the fact that Miller admits to having relied primarily on Robinson to seek permission from Alexander and that the two frequently rode together without either having sought permission. Regardless, even if Alexander's directive caused Miller some inconvenience, there is no evidence that it had any impact on her pay, hours, or job duties.

Similarly, neither Alexander's April 2015 reprimand, nor the February 2016 reprimand had any lasting effect on Miller's job. See Davis, 245 F.3d at 1241 ("Criticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit."). The April 2015 reprimand was purely admonitory and unaccompanied by any sort of substantive penalty or sanction. Moreover, while Alexander threatened during the February 2016 reprimand to demote Miller, the demotion was subsequently withdrawn, and Miller was instead transferred to a different supervisor. Miller does not allege that the transfer to a new supervisor was an adverse employment action. See Dkt. No. 58-1 at 64 (testifying that she was happy to be transferred to Brown's command).

Additionally, although it is unclear whether Miller intended to tether her work assignment discrimination claims to her racial discrimination claims, these incidents also do not constitute adverse employment actions. Specifically, Miller alleges that at various points during her time at the CID, Alexander arbitrarily singled out Miller to complete certain unreasonably difficult tasks, including working several evening shifts and implementing a scanning system in the evidence room. It does not appear that either of these tasks was intended to be a permanent fixture of

.O 72A
Rev. 8/82)

her job, but rather they were temporary assignments that would run for a prescribed period or until completion.

These so-called "work assignment claims" have been found to "strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." Davis v. Town of Lake Park, 245 F.3d 1232 (11th Cir. 2001). Ultimately, "[a] finding that job assignment or schedule changes rose to the level of adverse employment actions 'would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in federal courts.'" Sonko v. Exel, Inc., No. 1:15-cv-0684, 2016 U.S. Dist. LEXIS 187080 (N.D. Ga. July 21, 2016) (quoting Davis, 245 F.3d at 1244). Accordingly, courts have been empirically "reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm." Davis, 245 F.3d at 1244 (citing Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997)). In Davis, the court found that two instances where the plaintiff had been temporarily removed from a designated position and transferred to a different assignment were not adverse employment actions because the changes were not sufficiently substantial and material to have altered the terms, conditions, or privileges of employment. Id. at 1244-45. The court found it pertinent that the assignment change was only temporary and did

not impact the employees permanent job title or classification. Id. at 1245.

Likewise, there is no evidence that Miller's evening shift and evidence room assignments had any long-term material impact on her employment. Though she found the assignments to be frustrating, or at times even impractical, they were not associated with a decrease in pay or even a change in title. Nor, as was pertinent in Davis, were the assignments intended to be a permeant change in job duties. Moreover, Miller admits that she never completed a full evening shift and never implemented the scanning system, meaning the change, at best, had a negligible impact on her prior duties.

Finally, Miller argues that she was subject to an adverse employment action because she was constructively discharged from the DPD around the time she accepted her job with the school board. Though claims of constructive discharge can act as an independent cause of action in the Title VII context, they may also serve—like Miller alleges here—as the adverse employment action element of a prima face case under the McDonnel Douglas framework. Harper v. Ulta Salon Cosmetics & Fragrance, Inc., 1:05-cv-1285, 2006 U.S. Dist. LEXIS 98593, at *70-71 (N.D. Ga. Nov. 30, 2006). For Miller to establish that she was constructively discharged, she must show that her "working conditions [were] so intolerable that a

reasonable person would have felt compelled to resign." <u>Akins v. Fulton County</u>, 420 F.3d 1293, 1301 (11th Cir. 2005).

Miller has not asserted facts sufficient to establish that her alleged constructive discharge was related to racial discrimination. Indeed, most of the facts on which she relies to support her constructive discharge claim concern Defendants passing over her for promotions in favor of her male counterparts; however, that allegation relates solely to her claims of gender discrimination. At best, Miller argues that part of the basis for her decision to resign from the DPD was her belief that she would be terminated after Robinson's discharge. However, the evidence, even when construed in Miller's favor, in no way supports such a belief. To the contrary, the undisputed evidence shows , and Miller concedes, that after her disciplinary meeting on February 3, 2016, she was allowed to keep her position as an investigator. She also concedes that in the ensuing months, she was given a promotion to Sergeant, a pay raise, and that the February written reprimand was expunged from her record. She does not identify any other changes to the terms or conditions of her employment between these events and the time of her resignation that would suggest Defendants' attitude toward her had changed or that her termination was imminent.

Miller also alleges that Howard's hiring of her replacement, Robert Keith, in August 2016 substantiated her belief that her

72A
. 8/82)

termination was pending. However, Miller concedes that the school board had already contacted Howard about Miller's application for a new job in early-to-mid August. Miller disputes Defendant's contention that Keith was hired in late August 2016 as part of a "self-serving affidavit." Dkt. No. 60-1 at 21, ¶ 126. However, the date of Keith's hiring is supported by an employment record introduced by Defendants, the authenticity of which was sworn to by Howard. Miller has not introduced any evidence challenging the validity of that record. At best, Miller alleges that although she does not have any evidence, she does not "think that [the DPD] knew [she] was looking for another job when they hired [Keith]." Dkt. No. 58-1 at 127. She also stated, "I don't think that I even had interviews until September-ish." Id.

Because Miller has failed to show that she was subject to an adverse employment action with respect to her racial discrimination claims, she cannot establish a prima facie case of racial discrimination under the McDonnel Douglas framework.[3]

---

[3] Miller argues that even if she fails to establish a *prima face* case under the McDonnel Douglas framework, her case should nonetheless survive summary judgment because she has introduced a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination. . ." Dkt. No. 60 at 7 (quoting Smith v.Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). However, she has not cited to any authority for the proposition that she can survive summary judgment under the convincing mosaic standard without showing, at a minimum, that she suffered an adverse employment action. Cf. Holland v. Gee, 677 F.3d 1047, 1056 (11th Cir. 2012) ("In a Title VII case, an adverse employment action is not only an element of the prima facie case, but also of the claim itself.") (internal citations omitted). Indeed, cases discussing alternate frameworks to McDonnel Douglas generally allow plaintiffs to rely on these frameworks as an alternative to showing similarly situated comparators, rather than as an alternative to an adverse action. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012) (stating that the

Accordingly, Defendant's motion with respect to Miller's claims of racial discrimination under 42 U.S.C. § 1981 is **GRANTED**.

### III. Miller's Gender Discrimination Claims under 42 U.S.C. § 2000e *et seq.*

Miller also brings claims under Count I for gender discrimination in violation of Title VII. Miller does not purport to have direct evidence of gender discrimination. Accordingly, to establish a claim, she must rely on circumstantial evidence. We began by examining the McDonnel Douglas burden-shifting framework.

#### A. Prima Facie Case

As with her racial discrimination claims, Defendants challenge both the third and fourth elements of Miller's prima facie case concerning whether she was subject to an adverse employment action and whether Defendants treated comparators more favorably.

##### i. Adverse Employment Action

As explained above, Miller's allegations that she was discriminated against in her job assignments—including the evening

---

plaintiff "does not have to show a comparator if she can show enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination."); Smith, 644 F.3d at 1328 (stating that the plaintiff could present "circumstantial evidence that creates a triable issue" as an alternative to producing evidence of a comparator); Washington v. UPS, 567 Fed. App'x 748, (11th Cir. 2014) ("[The plaintiff's] failure to present a sufficient comparator was not necessarily fatal to her ADEA claim, however, as she could still have survived summary judgment if she had presented a sufficiently persuasive mosaic of circumstantial evidence that would allow a reasonable jury to infer intentional discrimination by the decisionmaker[s].") (internal quotation omitted). Where, as here, Miller has not established any adverse employment actions arising out of her racial discrimination claim, her claim necessarily fails irrespectively of other circumstantial evidence.

AO 72A
(Rev. 8/82)

shift and the evidence room assignments—were not adverse employment actions under Title VII. For similar reasons, her other allegations about vehicle assignments, long guns, and K-9 training, also fail to satisfy this element. None of these incidents entail a "serious and material change in the terms, conditions, or privileges of employment." Butler, 536 F.3d at 1215 (quoting Davis, 245 F.3d at 1239-40 (emphasis omitted). Though Miller alleges that she was assigned an unmarked vehicle that she deemed unsuited to the role of an investigator, she does not allege that her vehicle assignment rendered her unable to perform her job, nor does she allege that the assignments affected her pay, hours, or job duties. See Hooks, 183 Fed. App'x at 836. She further admits that after she filed a grievance with the department, she was assigned an unmarked vehicle that, aside from lacking lights and sirens, was otherwise adequate for her job. Similarly, while Miller alleges that she was not assigned a long gun like others on her SRT unit, she does not explain how this impacted the condition of her employment in any way. She also concedes to having eventually purchased her own long gun that she was later allowed to use on the job. Finally, Miller does not explain how Howard's instruction that she could not participate in K-9 training even relates to her own job as an investigator, much less how the restriction constitutes an adverse employment action. Accordingly,

the Court finds that these allegations do not make out a prima facie case of discrimination under Title VII.

Nevertheless, Miller has alleged an adverse employment action with respect to her pay and promotions. Specifically, Miller contends that, as a female investigator, she was paid less than her male predecessor and successor on the CID. See Heatherly v. Univ. of Ala. Bd. Of Trs., No. 18-13439, 2019 U.S. App. LEXIS 18473, at *6 (11th Cir. June 20, 2019) ("[D]isparate pay is undoubtedly an adverse employment action under Title VII"). Furthermore, she alleges that she was passed over for a promotion while working in the CID even though male officers with similar experience received a promotion.[4] See Church v. Ala. Law. Enf't Agency, No. 2:18-cv-536, 2018 U.S. Dist. LEXIS 193864, at *14 (M.D. Ala. Nov. 14, 2018) ("[A] failure to promote is an adverse employment action.") (citing Davis, 245 F.3d at 1241). Defendants argue this latter allegation does not represent a serious or material change to the conditions of her employment because the promotion given to male officers did not involve an increase in pay. However, Title VII "does not require proof of direct economy consequences in all cases." Holland, 677 F.3d at 1057 (11th Cir. 2012) (quoting Davis, 245 F.3d at 1239). Here, construing the

---

[4] Miller's claim that she was not formally assigned the title "Sergeant" after her promotion is not am adverse employment action. Indeed, while discrepancies in pay and substantive job duties can form the basis for an adverse employment action, the mere distinction in title did not affect her pay or other conditions of employment.

evidence in Miller's favor, a reasonable jury could conclude that Defendants' failure to promote her left Miller in a materially worse position that she would have been had she received a comparable promotion and thereby not promoting her affected the terms, conditions, or privileges of her employment. Accordingly, the Court finds that Miller has shown an adverse employment action with respect to her disparate pay and failure to promote claims.

### ii.  Similarly Situated Comparators

In general, the next step in establishing a prima facie case under the McDonnel Douglas framework is to show that the plaintiff's comparators were "similarly situated in all material respects." Lewis v. City of Union city, 918 F.3d 1213, 1227 (11th Cir. 2019) (on petition for rehearing) (internal quotation marks omitted). Though this test applies universally across all types of discrimination claims, see id. at 1227 n.11, the Eleventh Circuit has laid out more particular criteria with respect to claims of pay and promotion discrimination. See Harrington v. Disney Reg'l Entm't, Inc., 276 Fed. App'x 863, 871 (11th Cir. 2007) (stating that to establish a prima facie case for discrimination, "[t]he elements are different for the disparate pay and promotion claims.").

First, to establish a prima facie case of gender discrimination on the basis of a failure to promote, a plaintiff must show "(1) that [she] belongs to a protected class; (2) that

she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less qualified employees outside her class were promoted." <u>Brown v. Ala. DOT</u>, 597 F.3d 1160, 1174 (11th Cir. 2010). Here, Defendants effectively concede these elements with respect to Miller's claim that she was passed over for a promotion to Corporal. Indeed, Defendants do not dispute that Joe Creswell and Aaron Turner, who each were hired after Plaintiff, were promoted above her to Corporal before Miller received any promotions at the CID. Though they explain the discrepancy by contending that Miller's promotion would have been inappropriate in the context of her role as an investigator, this is not a challenge to her prima facie case, but rather an alleged non-discriminatory basis for the failure to promote—appropriate for the next stage of the burden-shifting analysis. Accordingly, the Court finds that Miller has alleged a prima facie case of failure to promote.

Alternatively, to establish a claim of pay discrimination in the Title VII context, a plaintiff must simply show that she was paid less than similarly situated comparators. <u>See Blackman v. Fla. Dep't of Bus. & Prof'l Regulation</u>, 599 Fed. App'x 907, 913 (11th Cir. 2015). In doing so, Miller asserts that her predecessor, Nick Roundtree, and her successor, Robert Keith, were paid more than her at the beginning of their tenure with the CID. Defendants, while conceding that Keith and Roundtree were paid more, argue

that they were not similarly situated because each started at the CID with substantially more experience than Miller. However, Defendants misapprehend the nature of the comparator analysis. The question of whether the comparators were similarly situated in the context of a pay discrimination claim does not concern whether the *employees* were similarly situated, but rather whether the *jobs* were the same. Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992) (stating that a plaintiff establishes a *prima facie* case of sex discrimination by showing that she is female and that "the *job* she occupied was similar to higher paying jobs occupied by males") (emphasis added); see also Sharp v. Global Sec. Int'l, 766 F. Supp. 2d 1272, 1294 (N.D. Ala. 2011) ("In the context of a wage discrimination claim brought under Title VII . . . a plaintiff satisfies his *prima facie* burden of comparability simply by showing that he 'occupies a job similar to that of a higher paid' person outside the protected class.") (quoting Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)). Instead, questions about relative education and experienced are best reserved for the next steps of the McDonnel Douglas framework wherein Defendants proffer their explanation for discrepancies in pay and the plaintiff offers evidence as to whether that explanation is pretext.[5] Here, however, Defendants do not challenge

---

[5] Defendants cite to Beard v. Lumbar Co., 206 F. App'x 852, 857 (11th Cir. 2006) for the proposition that a court can consider discrepancies in experience in determining whether comparators were similarly situated for purposes of a wage

AO 72A
(Rev. 8/82)

Miller's evidence that the jobs of her predecessor and successor were similar to her job as an investigator.

### iii. Other Evidence of Discrimination

In addition, Miller also meets her prima facie burden by introducing other "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith, 644 F.3d at 1328. This evidence includes her allegations that Alexander arbitrarily assigned her to evening shift and the evidence room; that she was assigned an inferior vehicle while at the DPD; and

---

dispute. This unpublished decision seems to clash sharply with the holdings from Miranda and its progeny. Since Miranda, the Eleventh Circuit and several district courts have held, consistent with Miranda, that the similarly situated comparators prong of the prima facie case in a wage dispute looks only to the types of jobs the plaintiff and comparators performed rather than to characteristics of the employees themselves. Johnson v. Coffee Cty. Comm'n, 714 Fed. App'x 942, 948 (11th Cir. 2017) ("To establish a prima facie case of discrimination based on a disparity in pay, a plaintiff must show that he occupies a position similar to that of a higher paid employee outside of his protected class."; Blackman, 599 Fed. App'x at 913 (finding that the plaintiff did not present a material dispute of fact "as to the similarly of her job and the jobs held by [her comparators]. . . because she introduced insufficient evidence concerning the actual content of the jobs held by these individuals."); Meeks, 15 F.3d at 1019 (quoting Miranda for proposition that a plaintiff must show she occupies a similar job to comparators to establish a prima facie case); Sharp, 766 F. Supp. 2d 1294-95 (contrasting the general rule that "individuals must be similarly situated in all relevant respects" with the specific rule relating to wage disputes that the comparators must occupy a similar job); Teal v. City of Dahlonega, No. 2:09-cv-0187, 2011 U.S. Dist. LEXIS 151344, at *30 (N.D. Ga. Aug. 24, 2011) (stating that under the McDonnel Douglas approach, "a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males").

At least one district court has noted that two unpublished Eleventh Circuit decisions, including Beard, have broken from the precedent established in Miranda. See White v. Thyssenkrupp Steel USA, LLC, 743 F. Supp. 2d 1340, 1344-48, 1348 n.11 (S.D. Ala. 2010). However, as the court found, "[u]npublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." Id. at 1348 (quoting Bonilla v. Baker Concrete Construction, Inc., 487 F.3d 1240, 1345 n.7 (11th Cir. 2007)). Because the weight of authority suggests that the approach laid out in Miranda is the appropriate way to assess wage discrimination claims, the Court declines to use the framework from Beard.

that she was denied the opportunity to fully participate in K-9 training.[6] Though none of these allegations is sufficient to constitute an adverse employment action under Title VII, they do, in the aggregate and juxtaposed with Miller's pay and promotion discrimination claims, tend to create "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (quoting Silverman v. Bd. Of Educ., 637 F.3d 729, 734 (7th Cir. 2011).

First, Miller contends that Alexander singled her out to work the evening shift and to incorporate a scanning system into the evidence room. Both tasks proved to be unduly difficult. With respect to the evening shift, Miller alleges that she found this assignment impossible because she could not complete certain investigatory tasks that necessitated day-time work, such as going to the bank, the judiciary, or the district attorney's office. She was also could not supplement her time with day-time work because of the department's opposition to overtime. Furthermore, Miller also found the evidence room assignment impracticable because she

---

[6] Miller's allegations with respect to the "long gun" do not create an adequate dispute of material fact to justify the inference that she was discriminated against on the basis of her gender. Indeed, Miller does not challenge the contention that the department had only four long guns to distribute among fifteen to eighteen members of the SRT. She further concedes that she lost a shoot-out for a weapon to Bobby Gault. Though she did allege that the Gault shoot-out was for a different weapon, and that Defendants "just decided to give him the M-4 as well," she ultimately equivocated on this issue, noting "[t]here could have been" a competition for the M-4, but that she did not remember. Ultimately, Miller's contentions on this issue simply do not create an adequate dispute of material fact such that a reasonable jury could conclude she was discriminated against on the basis of race with respect to Defendants' distribution of long guns.

AO 72A
(Rev. 8/82)

struggled to find someone to work with her in the evidence room in accordance with department policy. Though Defendants criticize Miller for having not put forth diligent effort—or having outright declined—to complete these assignments, they fail to provide an acceptable explanation for why Miller was chosen to complete these difficult tasks in the first place.

Next, Miller contends that, as an investigator, she was regularly assigned inferior vehicles to those of her male counterparts. Specifically, she contends that after the accident with her Impala, she was assigned a marked patrol vehicle that "would be considered the worst vehicle the department owns." Dkt. No. 58-1 at 162. She argues that, after having submitted a grievance, she received an unmarked Tahoe fitted with a radio, she never received a set of lights or sirens. She was also denied the opportunity to drive a seized Audi vehicle despite that her male successor was ultimately given that vehicle.

Defendants respond to Miller's allegations of discrimination first by indicating that Miller received the 2007 patrol car because there were no other fully-equipped vehicles available for her use at the time. They further contend that Miller was not assigned the Audi that she requested because Howard, her chief, was undecided about whether to sell the vehicle and ultimately used the vehicle for himself after shoulder surgery. He thereafter did not assign the Audi to Keith until Miller had given her notice

of intent to leave. These explanations are in dispute. Contrary to Defendants' contention, Miller alleges that the department did have a Tahoe or Suburban that would have been more suitable for her use at the time she was driving the 2007 patrol car. She further contends that Keith had been assigned the Audi prior to her having given notice of her intent to leave.

Finally, Miller alleges that she was deprived of the opportunity to fully participate in K-9 training because of her gender. Defendants evidence on this point is largely unchallenged. Indeed, Miller concedes that the DPD only retains large dog-bite suits and she could not specifically identify anyone at the DPD of her stature that was permitted to wear the suits. Nevertheless, she does introduce evidence that Howard at some point told her that she was not to wear the dog bite suit because "we take care of our women." Dkt. No. 58-1 at 163. This at least raises the inference that Howard's stated reason for barring her from K-9 training—that she was too small—was merely pretext.

In the aggregate, these instances tend to show a pattern of behavior that, viewed in a light most favorable to Miller, could cause a reasonable jury to conclude that she was discriminated against on the basis of gender. Accordingly, the Court finds that Miller has established a prima facie case of gender discrimination under Title VII.

### B. Non-Discriminatory Reason

Because Miller has established a prima facie case, the burden shifts to Defendants to provide a non-discriminatory basis for their adverse employment actions. The burden on the Defendant here is "exceedingly light," requiring only that they provide "a clear and reasonably specific non-discriminatory basis for its actions. . ." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769-70 (11th Cir. 2005) (internal quotations omitted).

First, Defendants argue that Miller was not promoted to Corporal along with Turner and Creswell because of the nature of her role as an investigator. Specifically, they contend that Miller's promotion to Corporal would not have entitled her to an increase in pay because the city manager at that time had barred all pay raises unless they were tied to a promotion to the rank of Sergeant or higher. Accordingly, they argue that promoting Miller to Corporal would have only given her more authority as a supervisor, but that this promotion would have been futile because Miller did not have anyone to supervise at that time.

Second, Defendants argue that Roundtree and Keith were entitled to more pay at the beginning of the tenure with the DPD because they had significantly more law enforcement experience than Miller had at the time that she started. While Miller did not have any specific law enforcement experience when she began as a patrol officer, according to an affidavit from Howard, Roundtree

and Keith had ten and twenty-five years of law enforcement experience, respectively. Accordingly, during their time at the DPD, Roundtree made $15.91 per hour and Keith made $18 per hour. Despite the existence of factual disputes, the Court finds based on these contentions that Defendants have provided non-discriminatory reasons for their actions against Miller.

### C. Pretext

At the final stage in the framework, the burden shifts back to Plaintiff to show that Defendants' proffered reasons are pretext for discrimination. "The inquiry into pretext requires [the Court] to determine whether, in view of all the evidence, 'the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct.'" Webb v. Int'l Bus. Machines Corp., 458 F. App'x 871, 876 (11th Cir. 2012) (quoting Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir.2001)). "To show pretext, [an employee] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). "The evidence of pretext may include

. . . the same evidence offered initially to establish the prima facie case." Wilson, 376 F.3d 1079, 1088 (11th Cir. 2004).

Here, Plaintiff has presented sufficient evidence to create a genuine dispute of material fact such that a reasonable jury could conclude that Defendants' proffered reasons for the adverse actions suffered by Miller were "not what actually motivated [their] conduct." Webb, 458 F. App'x at 876. First, with respect to her failure to promote claim, Miller disputes Defendants' contention that promoting her to corporal would have been futile by noting that the promotion would have entitled her to a supervisory role over at least two DPD employees—Chris Parker and Frank Williams—over whom she did not otherwise have authority. Though Defendants allege that Miller would not have had this supervisory authority as a Corporal, her testimony on this point creates material dispute of fact. Based on the evidence presented, a reasonable fact-finder could find that Defendant's stated reason for failing to promote Miller at the same time as Turner and Creswell was pretext, and that Defendants instead chose to pass over Miller for the promotion because of her sex.

Second, Miller alleges, with regard to her pay discrimination claim, that, despite having less experience than Keith and Roundtree, she had more education than any of her colleagues. Specifically, Miller testified that she "didn't know of anybody else" that had a Master's Degree in criminal justice. Dkt. No. 58-

1 at 72. Though it is not clear whether Miller is suggesting that she was more well-educated than others in the CID or than anyone in the entire DBD, Miller at least seems to suggest—and Defendants do not dispute—that she had more education than Keith and Roundtree, who were both paid more than her for equal, and perhaps less, work. Though Miller's education is not a dispositive factor that necessarily rendered her more qualified than her predecessor and successor, each whom had more experience, a reasonably jury could find, based on all the facts presented, that the DPD paid her less not because her colleagues had more experience, but rather because she was a woman. Accordingly, the Court finds that Miller has satisfied her burden of showing a material dispute of fact as to whether the stated reasons for Defendants' adverse employment actions against her were pretext. Therefore, Defendants motion to dismiss her Title VII action with respect to her gender discrimination claims is **DENIED**.

### IV. Miller's Retaliation Claims under 42 U.S.C. § 2000e *et seq*.

In Count III, Miller alleges that Defendants retaliated against her for opposing practices made unlawful under Title VII. To state a prima facie case for retaliation, a plaintiff must show "(1) that she engaged in protected activity under Title VII; (2) that she suffered a materially adverse action; and (3) that there was a causal connection between the two events." Manley v. Dekalb County, 587 Fed. App'x 507, 512 (11th Cir. 2014). As with the

burden shifting paradigm to state a claim of discrimination under Title VII, after a plaintiff states a prima facie case for retaliation, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse action. Hankins v. Airways, Inc., 237 Fed. App'x 513, 519 (11th Cir. 2007). The burden then shifts back to the plaintiff to show this stated reason was pretext. Id.

### A. Prima Facie Case

As a threshold matter, it is important to identify which activity that Miller deemed retaliatory for purposes of Title VII. According to Miller, Defendants first retaliated by "punish[ing] her for not participating in the racist requirement that she call any time she was in a vehicle with Robinson." Dkt. No. 60 at 21. Specifically, Miller alleges that she received "written discipline, verbal discipline, and was demoted to patrol." Id. However, retaliation claims, by definition, require that the plaintiff have expressed some opposition to allegedly unlawful activity under Title VII. See Hammonds v. Jackson, No. 1:13-cv-711, 2015 U.S. Dist. LEXIS 183808, at *43-44 (N.D. Ga. March 16, 2016)("Title VII prohibits an employer from retaliating against an employee because (1) she has 'opposed' a practice that Title VII forbids or (2) has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'") (quoting 42 U.S.C. § 2000e-3(a)). Here, Miller has not

introduced any evidence that Alexander's directive barring Miller and Robinson from riding in the same vehicle—or disciplinary acts taken in response to her violation of that directive—was in response to her having opposed some discriminatory act. Instead, Miller did not notify anyone at DPD that she viewed that directive as unlawful until at least February 2016, at which time she requested an "Equal Employment Opportunity Complaint." Dkt. No. 58-1 at 155. However, this was at least nine months after Alexander first issued the directive. Accordingly, the Court finds that any adverse action Defendants took against Miller with respect to her relationship with Robinson was not in retaliation for discriminatory acts she opposed under Title VII.

Alternatively, Miller contends that Defendants retaliated against her by threatening her with adverse action if she did not withdraw her February 2016 EEOC charge and thereafter mislead her about the nature of her retirement plan, such that her plan would no longer vest. Because these acts took place after Miller had filed her first EEOC charge, Defendants were clearly on notice that Miller opposed certain DPD practices as unlawful under Title VII. However, Defendants argue that these acts nevertheless fail to establish a prima facie case of retaliation because they were not materially adverse actions.

In contrast to showing that an employment action was materially adverse for purposes of a disparate treatment claim, to

establish a materially adverse action in a retaliation claim, the plaintiff need only show that the act "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Manley, 587 Fed. App'x at 512 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Defendants cite to Gant v. Miami-Dade Cty water & Swere Dep't, 636 F. App'x 462 (11th Cir. 2015) for the proposition that admonishing an employee for having filed an EEOC charge is not sufficient to constitute an adverse retaliatory action under Title VII. In Gant, the plaintiff's supervisor summoned the plaintiff into his office after he had filed an EEOC charge and "angrily told him to do 'damage control' and apologize to the people who he had accused of discrimination." Gant, 636 F. App'x at 464. The court found, based on these facts, that a reasonable employee would not "have been dissuaded from pressing a charge of discrimination if he had known in advance that his supervisor would tell him to withdraw the charge or would seek an apology." Id. at 469.

Gant, however, is distinguishable. First, in finding that there was no retaliation, the court relied, at least in part, on the fact that the evidence in the record on this issue was "limited." Id. In contrast, the record in this case is replete with examples of direct or implied threats that Defendants would take adverse action against Miller if she did not withdraw her EEOC charge. Miller introduced evidence of these threats not only

through her own testimony, but also through recorded conversations between herself and Defendants, which have been transcribed and are incorporated into to the record. Specifically, Miller alleges that during the meeting on March 31, 2016, Davis told her that if she put himself, Alexander, and Howard "up on the spot" that they would have to "fire back." Dkt. No. 61-2 at 29. She also testified that in a separate meeting, Davis told her that "he was going to go around the entire department and have everybody else write a statement contradicting what [she] said at [her] grievance and . . . would have to get [the] GBI involved and . . . negate what [she] was saying." Dkt. No. 58-1 at 100. Miller eventually began to fear that "if [Davis] could get everybody else in the department to write a statement contradicting what [she] said, then. . . [she] could potentially be facing criminal charges with the GBI, losing [her] job and losing [her] certification." Id. at 103.

Furthermore, unlike the supervisor in Gant who merely demanded that the plaintiff apologize for his accusations of discrimination, Miller alleges specific threats to not only damage her career, but potentially subject her to criminal penalties. The court finds that these threats, if proven to have been made, would be sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination." Gant, 636 Fed. App'x at 469 (quoting Burlington, 548 U.S. at 68).

The Court cannot find, however, that the apparently false statement by Howard that Miller could remain at the DPD as a part-time officer was a deliberate effort to retaliate against her for having filed an EEOC charge. By that time, Miller had withdrawn her original charge and applied for a different position with the school board. Though Howard did mislead Miller by telling her that she could work part-time at the DPD until her retirement vested, there is no evidence that he did so with the intent to deceive. Instead, it seems that Howard simply misunderstood the nature of the city's retirement scheme. Miller concedes that after Davis consulted with the city attorney, he acknowledged Howard's mistake to Miller and offered to let her return to the DPD as a full-time patrol officer.

In an apparent effort to suggest that Davis lied about part-time employees not being able to accrue credit toward retirement, Miller points to deposition testimony from Howard to the effect that male employees were allowed to work part-time as patrol officers. However, this does not establish that DPD employees could accrue retirement credit in part-time positions. If anything, the statement tends to justify Howard's original misunderstanding because if Howard was aware that patrol officers worked part-time at the DPD, he may have mistakenly believed that those officers were accruing credit toward retirement. Furthermore, Miller contends that she had discussed her plans with the city clerk who

Case 2:17-cv-00144-LGW-BWC   Document 65   Filed 11/05/19   Page 61 of 67

"said that [she] had to work so many hours." Dkt. No. 58-1 at 120–21. However, this vague description of Miller's conversation with a city clerk does not support an allegation that Davis lied to her about not being able to accrue credit toward retirement as a part time employee, nor does it undermine the contention that Howard misunderstood the nature of the city's retirement system.

Finally, Miller seems to argue that Davis's refusal to allow Miller to return to the CID was retaliatory. However, this argument simply defies common sense. By the time Davis made the offer to let her return as a patrol officer, Miller had accepted the position at the school board and the DPD had hired her replacement. It is reasonable to assume that the DPD could not accommodate Miller as a full time CID employee by that time. Accordingly, the Court finds that neither Davis's statement to Miller about working part time, nor his offer to allow her to return to patrol, were retaliatory.

### B. Non-Discriminatory Reason

Nevertheless, because Miller has established a prima facie case that Defendant's threatening statements to Miller constitute adverse employment actions, the burden shifts to Defendants to provide a non-discriminatory basis for these statements. First, Defendants contend that Davis's first meeting with Miller began as an innocent effort to consult with Miller about whether she intended to pursue the EEOC charge after an EEOC investigator

AO 72A
(Rev. 8/82)

called him in June 2016 to remind him that the city's response would be due shortly. This assertion, however, is bellied by transcripts that show Davis met with Miller multiple times as early as March of that year. Furthermore, even if Davis's characterization of why he first met with Miller was true, this would not explain the allegedly threatening statements.

Alternatively, Defendants argue that the statements were not threatening at all, but rather conditional statements of fact. In other words, Davis meant to suggest that *if* Miller's allegations of discrimination were false, the department may have to take adverse action against her. Though this characterization is disputed, it would, if proven true, provide a valid non-discriminatory basis for the Davis's statements.

### C. Pretext

Miller has satisfied her burden to show that Defendants' proffered reason for the allegedly threatening statements were pretext. As noted above, Miller has pointed to a several examples of statements that would have reasonably caused her to believe that Defendants would solicit false statements from DPD personnel contradicting Miller's claims of discrimination and use those statements to take criminal action against Miller. At best, Defendants point to testimony from Miller that she was "not worried" about these threats because she had not made any false statements. See Dkt. No. 58-1 at 102. This cherry-picked section

from Miller's testimony is misleading. Indeed, while Miller did state that she told Davis she was "not worried" about his threats to obtain contradictory statements, she also specifically testified that she "felt like the whole department was trying to falsify everything [she] was saying. Like they were all going to come together and say this isn't happening and she's just making this up. . ." Id. at 100. Construing the facts in favor of Miller, a reasonable jury could believe that, though Miller may have postured as unphased by Davis's threats, she was genuinely concerned that Defendants would take draconian measures to prove her claims false. Accordingly, Defendants motion with respect to Miller's retaliation claim under Title VII is **DENIED.**

### V.   Qualified Immunity

As a final matter, Defendants contend that they are entitled to qualified immunity for their alleged Title VII violations. The court will address this argument only as it concerns those acts that it has determined to be adverse employment actions. Qualified immunity grants "complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). The Eleventh Circuit has summarized the qualified immunity framework as follows:

> To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. If, <u>and only if</u>, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law.

<u>Estate of Cummings v. Davenport</u>, 906 F.3d 934, 940 (11th Cir. 2018), <u>petition for cert. filed.</u>, No. 18-1191 (U.S. Mar. 3, 2019). The Plaintiff's burden is divided into a two-step inquiry. "First, the court must ask whether the plaintiff's allegations, if true, establish the violation of a constitutional or statutory right. If a constitutional or statutory right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established." <u>Bogle v. McClure</u>, 332 F.3d 1347, 1355 (11th Cir. 2003) (citations omitted). The Court has discretion to analyze these two-steps in either order. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

Here, neither party raises any dispute about whether Defendants' actions were part of their discretionary authority, nor do they question whether Miller's allegations establish a violation of a statutory right. Instead, the only question before the Court is whether the statutory rights Defendants allegedly violated under Title VII were "clearly established." <u>Bogle</u>, 332 F.3d at 1355. As a general matter, there can be no doubt that the right to be free from gender discrimination and retaliation in the workplace is clearly established under Title VII. "However, the

clearly established prong of the qualified immunity analysis asks the question in light of the specific context of the case, not as a broad general proposition." Rioux v. City of Atlanta, 520 F.3d 1269, 1283 (11th Cir. 2008) (internal quotation marks and citations omitted). "We therefore turn to an examination of whether the defendant's conduct was nonetheless objectively reasonable in light of that [Equal Protection] right." Id. (internal quotation marks and citations omitted). It is under this more specific inquiry that the Court turns to the rule set out in Foy v. Holston, 94 F.3d 1528, 1534-35 (11th Cir. 1996). In Foy, the Eleventh Circuit recognized that "state officials can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully." Id. at 1534. It explained further that "state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent." Id. Thus, the court concluded that "[u]nless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct—despite his having adequate lawful reasons to support the act—was the result of his unlawful motive, the defendant is entitled to [qualified] immunity." Id. at 1535. The Eleventh Circuit has since explained that a "defendant is entitled to qualified immunity under the Foy rationale only where, among other things, the record

indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations." Bogle, 332 F.3d at 1356 (quoting Stanley v. City of Dalton, 219 F.3d 1280, 1296 (11th Cir. 2000)); see also, Ham v. City of Atlanta, 386 F. App'x 899, 905-07 (11th Cir. 2010) (denying qualified immunity where the record did not indisputably show that defendants were motivated at least in part by lawful considerations); Mitchell v. City of Jacksonville, 734 F. App'x 649, 651 (11th Cir. 2018) (same).

Here, the Court simply cannot conclude that the adverse acts Defendant is alleged to have taken against Plaintiff were *indisputably* motivated by lawful considerations. First, with respect to Miller's wage discrimination claim, Defendants' only lawful explanation for having paid Keith and Roundtree at a higher rate than Miller was that the two had more experience. However, they do not dispute Miller's contention that had more education. Though it is certainly possible that Defendants were at least partly motivated to pay Keith and Roundtree at a higher rate because of their experience, it is also possible, construing the evidence in a light most favorable to Miller, that this rationale was only pretext for assigning Miller lower wages because of her gender.

Second, Defendants attribute their failure to promote Miller to Corporal at the same time as other male coworkers largely to the fact that Miller would not have had any additional work

responsibilities at the CID in that position. Miller introduces evidence calling this rationale into question by identifying two specific individuals over whom she would have had additional supervisory authority in her position as Corporal. As such, Defendants only non-discriminatory explanation for failing to promote Miller is also in dispute.

Finally, Defendants' only plausible explanation for allegedly threatening Miller with a criminal investigation if she did not drop her first EEOC charge was that statements made were not intended as threats. However, based on the evidence in the record, a reasonably jury could reach the opposite conclusion with respect to how those statements could be interpreted. Accordingly, the Court finds that Defendants are not entitled to qualified immunity.

## CONCLUSION

Defendants' motion for summary judgment, dkt. no. 53, is **GRANTED in part and DENIED in part.** It is **GRANTED** with respect to Plaintiff's race discrimination claims under 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981; it is **DENIED** as to Plaintiff's gender discrimination claims and retaliation claims under 42 U.S.C. § 2000e *et seq.*

**SO ORDERED**, this 5th day of November, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA